UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

NAZDAR RAHSID ALZAYADIE,               )   Case No. 09-CV-1886-JLS (JMA)
                                        )
                    Plaintiff,          )   **REPORT AND RECOMMENDATION
                                        )   OF UNITED STATES MAGISTRATE
v.                                      )   JUDGE RE PLAINTIFF'S MOTION
                                        )   FOR SUMMARY JUDGMENT [DOC.
MICHAEL J. ASTRUE, Commissioner of      )   16], DEFENDANT'S CROSS-MOTION
Social Security,                        )   FOR SUMMARY JUDGMENT [DOC.
                                        )   19], AND DEFENDANT'S MOTION TO
                    Defendant.          )   STRIKE [DOC. 23]**
                                        )
────────────────────────────────────── )

Plaintiff Nazdar Rahsid Alzayadie ("Plaintiff")[1] seeks judicial review of Defendant

Social Security Commissioner Michael J. Astrue's ("Defendant") determination that she

is not entitled to supplemental security income ("SSI") benefits.  The parties have filed

cross-motions for summary judgment.  Additionally, Defendant has filed a motion to

strike Plaintiff's response in opposition to his cross-motion for summary judgment.  For

the reasons set forth below, the Court recommends that Plaintiff's motion for summary

judgment be **GRANTED IN PART**, that Defendant's cross-motion for summary

judgment be **DENIED**, that Defendant's motion to strike be **GRANTED IN PART** and

**DENIED IN PART**, and that the case be remanded for further proceedings.

//

─────────────────

[1]  According to the record, the correct spelling of Plaintiff's name is Nazdar Rashid
Alzayadi.  (See, e.g., Admin. R. at 134, 225.)

## I.  PROCEDURAL HISTORY

Plaintiff filed an application for SSI benefits on May 23, 2006 alleging a disability onset date of May 2, 2005 due to depression and knee and leg problems.  (Admin. R. at 134-37, 145-51.)  Plaintiff's disability claim was denied initially on August 21, 2006 and again upon reconsideration on January 31, 2007.  (Id. at 77-81, 85-90.)  On March 26, 2007, Plaintiff requested an administrative hearing.  (Id. at 92-93.)  A hearing was conducted on August 4, 2008 by Administrative Law Judge ("ALJ") Eve B. Godfrey, who determined that Plaintiff was not disabled.  (Id. at 8-18.)  Plaintiff requested a review of the ALJ's decision; the Appeals Council for the Social Security Administration ("SSA") denied Plaintiff's request for review on March 10, 2009.  (Id. at 1-3.)  Plaintiff then commenced this action pursuant to 42 U.S.C. § 405(g).

## II.  FACTUAL BACKGROUND

Plaintiff was born on January 1, 1978.  (Id. at 134.)  She and her parents and siblings came to the United States from Iraq in 1993.  (Id. at 29.)  She obtained a high school diploma and attended one semester at Southwestern College.  (Id. at 31.)  She and her husband married in 1998.  (Id. at 30.)  She stopped attending college after getting pregnant and has never worked.  (Id. at 31, 146.)  Plaintiff and her husband have four children, who were ages 9, 6, 4, and 1 year at the time of the administrative hearing in this case.  (Id. at 32.)

## III.  MEDICAL EVIDENCE

### A.    Jennifer J. Wu, M.D., Treating Physician, UCSD Medical Center (2005-2007)

Plaintiff was seen by Dr. Jennifer J. Wu, family practitioner, in January 2005 for persistent kidney pain, leg pain, lumbar back pain, and varicose veins.  (Id. at 300-01.)  In March 2005, Dr. Wu noted that a lumbar spine MRI taken the prior month showed degenerative disk disease, most significantly at the L4-L5 level with a broad-based disk bulge with a small posterior high-density zone present.  (Id. at 299-300, 359-60.)  An MRI of Plaintiff's left knee showed mild left lateral meniscus irregularity with varicose veins present.  (Id. at 298, 300.)  Plaintiff's complaints of left knee pain and pain caused

by varicose veins continued in June and September 2005.  (Id. at 298-99.)  Dr. Wu noted in September 2005 that Plaintiff's back MRI results did not support a cause for lower left extremity pain.  (Id. at 298.)  In March 2006, Plaintiff was seen for continued kidney and leg pain, as well as depressed mood and reduced libido.  (Id. at 217.)  She tried a trial of Lexapro without success.  (Id. at 209.)  In July 2006, Plaintiff reported that Zoloft had not improved her mood, and complained of continued left back pain, continued leg pain despite having had vascular surgery, and a burning sensation in her lower leg radiating to her knee.  (Id. at 272-73.)  Dr. Wu opined that a neuropathy medication such as gabapentin should be considered.  (Id. at 273.)

In September 2006, Plaintiff reported to Dr. Wu that she had been denied disability.  (Id. at 260-61.)  She stated that she felt depressed, hopeless, and tired, and that she would be unable to concentrate in even a sedentary job.  (Id.)  Dr. Wu wrote a letter on Plaintiff's behalf which indicated that Plaintiff was unable to work due to her depression and overall physical pain.  (Id. at 307.)  In November 2006, Plaintiff reported having a lot of stress at home and stated that her day was usually full of chores, including making three meals for her mother-in-law and family as well as taking care of her three children.  (Id. at 259.)  Two weeks later, Plaintiff was reported to be 5 weeks pregnant with her fourth child.  (Id. at 257.)

In October 2007, Dr. Wu opined in a letter that Plaintiff was chronically disabled due to her history of depression and limb pain, neither of which had responded to treatment in the usual manner.  (Id. at 348-49.)

**B.    Niren Angle, M.D., Treating Vascular Surgeon, UCSD Medical Center (2006)**

Plaintiff consulted with Dr. Niren Angle, a vascular surgeon, in April and May 2006 regarding her varicose veins.  (Id. at 207-08.)  Dr. Angle noted that Plaintiff's symptoms were quite disabling as she experienced pain and aching upon standing for any period of time.  (Id. at 207.)  A duplex ultrasound showed, *inter alia*, bilateral saphenofemoral junction incompetence and reflux throughout the saphenous vein in the thigh.  (Id. at 207.)  Dr. Angle recommended that Plaintiff undergo radiofrequency

ablation ("vein stripping") of the greater saphenous vein of the left leg followed later by the same procedure in the right leg.  (Id. at 207, 274.)  The procedure was performed on the left leg in June 2006.  (Id. at 274-75.)  In August 2006, Plaintiff reported that her leg felt the same and that the surgery had not helped.  (Id. at 272.)  Dr. Angle concluded that Plaintiff's leg symptoms were not a result of the vein stripping nor any vascular condition, and referred her to neurology.  (Id.)

**C.    Ajit Raisinghani, M.D., Seagate Medical Group, Examining Physician (2006)**

Plaintiff underwent an internal medicine evaluation with Dr. Ajit Raisinghani of Seagate Medical Group on July 25, 2006 at the request of the Department of Social Services.  (Id. at 219-23.)  Dr. Raisinghani opined that Plaintiff had no limitations.  (Id. at 223.)

**D.    Romualdo R. Rodriguez, M.D., Seagate Medical Group, Examining Psychiatrist (2006)**

Plaintiff underwent a psychiatric evaluation with Dr. Romualdo R. Rodriguez on July 30, 2006 at the request of the Department of Social Services.  (Id. at 226-32.)  Dr. Rodriguez set forth the following in his report:

> The claimant has never worked outside the home but she works as a housewife taking care of full chores around the house and taking care of her three children who are two, five and seven years of age.  She stated that in the Muslim religion the woman stays home and does not work.  Her husband prefers it that way and additionally, her husband does not let her drive, although she has a driver's license.

(Id. at 228.)  Dr. Rodriguez found that from a psychiatric point of view, Plaintiff did not have a severe impairment and that she had, at most, mild functional limitations.  (Id. at 231.)  He opined that Plaintiff should improve from her depression over the next twelve months as her antidepressants were adjusted.

**E.    H. Amado, M.D., Non-Examining Doctor (2006)**

On August 7, 2006, state agency physician H. Amado, M.D., completed a Psychiatric Review Technique Form.  (Id. at 234-44.)  There is no indication that Dr. Amado conducted an examination of Plaintiff.  Dr. Amado found that Plaintiff did not

have any severe impairments and did not have any functional limitations other than mild limitations.  (Id. at 234, 242, 244.)  Dr. Amado acknowledged placing "great weight" on the psychiatric consultative evaluation by Dr. Rodriguez.  (Id. at 244.)

**F.     James Santiago Grisolia, M.D., Neurologist (2007-2008)**

Plaintiff consulted with Dr. James Santiago Grisolia, a neurologist, in May 2007.  (Id. at 356.)  She reported that she had experienced low back pain radiating to her left lower extremity since 1998, apparently developing after giving birth.  (Id.)  Plaintiff stated that she had a great deal of pain nocturnally, and could only stand or walk for 30 minutes before resting.  (Id.)  Because of Plaintiff's left calf pain, which appeared to be more than the local pain caused by varicose veins, as well as the pain and tingling in S1 distribution and a positive straight leg test, Dr. Grisolia referred Plaintiff for a lumbosacral MRI.  (Id.)  Although Dr. Grisolia had not yet seen the MRI reports by the time of Plaintiff's follow-up visit in July 2008, he opined that if any significant disk or bony pathology was found, such results would provide objective support for Plaintiff's disabling back pain.  (Id. at 355.)

**G.     Lumbar MRI & Dr. Wu's Interpretation Thereof (2008)**

In January 2008, Plaintiff underwent MRIs of the lumbar spine and left knee.  (Id. at 357-58.)  The lumbar MRI showed mild degenerative disk disease at L4-L5 and L5-S1, and "encroachment on the left L5 nerve root from facet hypertrophy and left paracentral disc bulge."  (Id. at 357.)  In February 2008, apparently after interpreting these results, Dr. Wu stated in a letter that Plaintiff's back pain and neuropathic leg pain were caused by the nerve impingement of her left L5 nerve root and disk bulge.  (Id. at 347.)

**H.     Ronald A. Zappone, M.D., Psychiatrist (2007)**

In a letter dated August 27, 2007, addressed to the State Department of Social Services, Dr. Ronald A. Zappone, psychiatrist, stated that Plaintiff had reported becoming increasingly depressed over the previous few years.  (Id. at 327.)  She had a one month old child and had felt more depressed since the birth of her child.  (Id.)

Plaintiff related having had a very difficult childhood while living in Iraq.  Her father had been imprisoned for 15 years and she witnessed much violence and death.  (Id.)  Dr. Zappone determined that Plaintiff had marked impairments in her ability to perform work functions.  (Id. at 328, 337.)  Dr. Zappone further opined that Plaintiff met Listings 12.04 and 12.06 of the Listing of Impairments in the regulations and that she was permanently disabled.  (Id. at 329-30.)

**I.      Harry C. Henderson, M.D., Psychiatrist (2008)**

In July 2008, Dr. Harry C. Henderson, psychiatrist, reported that he had been seeing Plaintiff since July 2007.  (Id. at 352.)[2]  He stated that Plaintiff suffered from severe depression and post-traumatic stress disorder dating from her war experiences, as Plaintiff's Kurdish family was persecuted in Iraq.  (Id.)  Dr. Henderson opined that the combination of Plaintiff's chronic and severe low back pain, kidney problems, neuropathy, depression, and post-traumatic stress syndrome prevented her from gainful employment.  (Id. at 354.)  In August 2008, Dr. Henderson wrote a report in which he expressed his disagreement with the opinion of Dr. Rodriguez, the examining psychiatrist with Seagate Medical Group.  (Id. at 361.)

**IV.  THE ADMINISTRATIVE HEARING**

The ALJ conducted an administrative hearing on August 4, 2008.  (Id. at 19.)

**A.      Plaintiff's Testimony**

Plaintiff testified at the hearing with the aid of an interpreter.  (Id. at 21-22.)  She has her driver's license but does not go anywhere without her husband.  (Id. at 28.)  Her husband or sister-in law care for her children as she cannot do so.  (Id. at 33.)  She has pain and puffiness in her legs after standing or walking for 30 to 60 minutes.  (Id.)  She started having back pain after she had her second child.  (Id. at 34.)  A doctor recommended surgery for her bad disks but she decided not to proceed with it as success was not guaranteed.  (Id. at 34, 63.)  Plaintiff does not cook and her sister-in-

---

[2]  Elsewhere in the record, it is indicated that Plaintiff's treatment with Dr. Henderson started in December 2005 (see Admin. R. at 364) and September 2006 (see id. at 376).

law does the laundry for her.  (Id. at 35.)  Plaintiff was prescribed eyeglasses but does not wear them because she cannot see well with them on.  (Id. at 36.)  Plaintiff testified about her medication regimen and stated that she gets kidney stones from time to time. (Id. at 37-40.)

Plaintiff testified that wives of her religion usually do not work outside of the home but that her husband also does not allow her to work because of her illness.  (Id. at 40-41.)  Her pain is continuous but sometimes becomes more severe.  (Id. at 42-43.)  Her left leg pain is more severe than her right leg pain.  (Id. at 44.)  Her back pain is always in the bottom of her back, and is sometimes so severe that she cannot leave her bed. (Id.)

Plaintiff started having psychological problems in 2004 when she had her daughter.  (Id. at 44-45.)  At times, she does not want anyone around her, gets angry, and cries.  (Id.)  She sleeps only two to three hours per night; during the day, she only sleeps or sits.  (Id. at 45.)  Her pain medication makes her feel dizzy and sleepy.  (Id. at 46.)  She feels hopeless, sad, and depressed.  (Id. at 46-47.)

**B.   Sister-in-Law's Testimony**

Intedhar Alzayadi, Plaintiff's husband's sister, testified at the hearing.  She is separated from her husband and has three children, ages 11, 9 and 5.  (Id. at 48-49.) She cares for her children and spends approximately four hours per day caring for her mother, who is paralyzed.  (Id.)  She has been paid to care for her mother for the past twelve months.  (Id. at 59-60.)  She testified that Plaintiff is very sick and very tired and that her illness started when she had her first son about two years before.  (Id. at 51, 53.)  Plaintiff needs help to stand up, and her symptoms have worsened over time.  (Id. at 51-52.)  She goes to Plaintiff's house every day and does her cooking and laundry. (Id. at 52-53.)  She takes her own children with her, who play with Plaintiff's children. (Id. at 54.)  She gives Plaintiff her medication.  (Id. at 57.)  Plaintiff forgets a lot, gets angry, cries, and complains of pain.  (Id.)

//

**C.    Medical Expert Testimony**

John R. Morse, M.D. testified as a medical expert ("ME") at the administrative hearing.  He testified that Plaintiff did not meet or equal any of the Listings in the Listing of Impairments.  (Id. at 62.)  He stated that he had not seen Plaintiff's lumbar MRI results and thus could not determine whether Plaintiff's back condition required surgical intervention.  (Id. at 63.)  The ME testified that excluding any psychiatric issues, he did not believe Plaintiff's history of nephrolithiasis (kidney stones) was severe by Social Security standards.  (Id. at 64.)  He also stated that varicose veins are not a severe impairment in the absence of deep vein thrombosis.  (Id.)  He testified that Plaintiff could perform light activity even assuming she had degenerative disk compression of her lumbar spine.  (Id.)  The ME did not see the report of Plaintiff's knee MRI, but noted that Dr. Raisinghani, as part of his consultative examination, indicated the knee was essentially normal.  (Id. at 65.)

**D.    Vocational Expert Testimony**

Vocational expert ("VE") witness Alan E. Cummings testified at the administrative hearing.  In response to a hypothetical question posted by the ALJ, the VE testified that a younger individual with a high school education who could perform unskilled work in the sedentary and light categories could perform work as a packager, assembler, or sorter.  (Id. at 67.)  Plaintiff could still perform this work even if she could only stand or walk for 30 minutes at a time because these jobs offer a sit or stand option.  (Id. at 69.)  However, if she could only walk for 30 minutes in an entire day, that would preclude full time work.  (Id.)

**V.  THE ALJ DECISION**

After considering the record, ALJ Godfrey made the following findings:

. . . .

2.    The claimant has the following severe impairments:  depression, degenerative disc disease of the lumbar spine; history of kidney stones and history of varicose veins [citations omitted].

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in [the Social

09cv1886

1    Security Regulations] [citations omitted].

2    4.    After careful consideration of the entire record, the undersigned
           finds that the claimant has the residual functional capacity to
3          perform light work as defined in 20 C.F.R. 416.967(b) except that
           the claimant is mentally limited to simple unskilled work with a sit
4          stand option.

5    . . . .

6    9.    Considering the claimant's age, education, work experience, and residual
           functional capacity, there are jobs that exist in significant numbers in the
7          national economy that the claimant can perform [citations omitted].

8    10.   The claimant has not been under a disability, as defined in the
           Social Security Act, since May 23, 2006, the date the application
9          was filed [citation omitted].

10   (Id. at 10-17.)

11   **VI.  STANDARD OF REVIEW**

12        To qualify for disability benefits under the Social Security Act, an applicant must

13   show that:  (1) He or she suffers from a medically determinable impairment that can be

14   expected to result in death or that has lasted or can be expected to last for a continuous

15   period of twelve months or more, and (2) the impairment renders the applicant

16   incapable of performing the work that he or she previously performed or any other

17   substantially gainful employment that exists in the national economy.  See 42 U.S.C. §

18   423(d)(1)(A), (2)(A).  An applicant must meet both requirements to be "disabled."  Id.

19   Further, the applicant bears the burden of proving that he or she was either permanently

20   disabled or subject to a condition which became so severe as to disable the applicant

21   prior to the date upon which his or her disability insured status expired.  Johnson v.

22   Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995).

23   **A.    Sequential Evaluation of Impairments**

24        The Social Security Regulations outline a five-step process to determine whether

25   an applicant is "disabled."  The five steps are as follows:  (1) Whether the claimant is

26   presently working in any substantial gainful activity.  If so, the claimant is not disabled.

27   If not, the evaluation proceeds to step two.  (2) Whether the claimant's impairment is

28   severe.  If not, the claimant is not disabled.  If so, the evaluation proceeds to step three.

(3) Whether the impairment meets or equals a specific impairment listed in the Listing of Impairments.  If so, the claimant is disabled.  If not, the evaluation proceeds to step four. (4) Whether the claimant is able to do any work he has done in the past.  If so, the claimant is not disabled.  If not, the evaluation continues to step five.  (5) Whether the claimant is able to do any other work.  If not, the claimant is disabled.  Conversely, if the Commissioner can establish there are a significant number of jobs in the national economy that the claimant can do, the claimant is not disabled.  20 C.F.R. § 404.1520; see also Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

**B.    Judicial Review**

Sections 205(g) and 1631(c)(3) of the Social Security Act allow unsuccessful applicants to seek judicial review of the Commissioner's final agency decision.  42 U.S.C.A. §§ 405(g), 1383(c)(3).  The scope of judicial review is limited.  The Commissioner's final decision should not be disturbed unless:  (1) The ALJ's findings are based on legal error or (2) are not supported by substantial evidence in the record as a whole.  Schneider v. Comm'r of Soc. Sec. Admin., 223 F.3d 968, 973 (9th Cir. 2000).  Substantial evidence means "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).  The Court must consider the record as a whole, weighing both the evidence that supports and detracts from the ALJ's conclusion.  See Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001); Desrosiers v. Sec'y of Health & Human Servs., 846 F.2d 573, 576 (9th Cir. 1988).  "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities."  Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir. 2009) (citing Andrews, 53 F.3d at 1039).  Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed.  Vasquez, 572 F.3d at 591 (citation and quotations omitted).

Section 405(g) permits this Court to enter a judgment affirming, modifying, or reversing the Commissioner's decision.  42 U.S.C.A. § 405(g).  The matter may also be

09cv1886

remanded to the SSA for further proceedings.  Id.

**VII.  DISCUSSION**

**A.    Defendant's Motion to Strike**

Defendant moves to strike Plaintiff's response in opposition to his cross-motion for summary judgment (captioned as Plaintiff's "reply") on the bases that it was not timely filed and that it contains evidence that is not part of the administrative record.  In the alternative, Defendant asks the Court to consider his motion to strike as his surreply.

**1.    Timeliness of Plaintiff's Response**

Plaintiff's motion for summary judgment was filed with a hearing date of May 7, 2010.  (Doc. 16.)  On April 12, 2010, the Court issued an order extending the time for Defendant to respond to Plaintiff's motion for summary judgment from April 9, 2010 to May 10, 2010.  (Doc. 18.)  A new hearing date was not set forth in the order.  (Id.) Defendant filed both a cross-motion for summary judgment and an opposition to Plaintiff's motion for summary judgment on May 10, 2010.  (Docs. 19, 20.)  Plaintiff filed a document captioned as a "reply" on June 10, 2010.  (Doc. 22.)  No hearing date was indicated on the cross-motion, opposition, or reply.

The briefing schedule for social security matters is set forth in the Civil Local Rules:

> [A]ny notice of motion for summary judgment or for other disposition on the merits without a trial plus all necessary supporting documents must be filed with the clerk and served on the other party or the party's attorney not later than sixty (60) days prior to the date for which the matter is noticed. If the opposing party wishes to file a cross-motion for summary or for other disposition on the merits without trial, that party must comply with the filing requirements of Civil Local Rule 7.1 e.1 (i.e., such cross-motion must be filed twenty-eight (28) days prior to the date for which the matter is noticed.  (Any opposition to the cross-motion must be filed and served no later than 14 days prior to the day for which the matter is noticed.)  Any reply to that opposition must be filed and served not later than seven (7) days prior to the date for which the matter is noticed.

Civ. L.R. 7.1 e.6.  Therefore, any opposition by Plaintiff to Defendant's cross-motion was to have been filed and served no later than 14 days prior to the hearing date.

Defendant contends that the 30-day extension of time to file his response to

1   Plaintiff's motion for summary judgment changed the hearing date from May 7, 2010 to

2   June 7, 2010.  Def.'s Mem. in Supp. of Mot. to Strike at 1.  Although this is a reasonable

3   assumption and it is arguable that Plaintiff should have made this same assumption, it is

4   also true that the Court did not set a new hearing date after granting the 30-day

5   extension of time to Defendant, and the parties did not set forth a hearing date on the

6   caption of any pleadings filed subsequent to Plaintiff's motion for summary judgment.

7   Although it would have been more prudent for Plaintiff to either clarify the hearing date

8   with the Court or reach a stipulation with Defendant regarding a due date for her

9   response than to simply file her "reply" a full 31 days after Defendant filed his cross-

10  motion (Plaintiff would have had only 14 days to do so under the usual social security

11  briefing schedule), the Court is reluctant to strike the reply on the basis that it was

12  untimely as there was obvious confusion about the hearing date in this matter.

13  Therefore, the Court recommends that Defendant's motion to strike on the basis that

14  Plaintiff's response was untimely filed be **DENIED**.[3]

15          **2.      Extra-Record Evidence**

16          Defendant also contends that Plaintiff's reply should be stricken as it contains

17  exhibits that are not a part of the administrative record, namely, an affidavit by Plaintiff

18  dated May 28, 2010, treatment notes from Dr. Zappone, and treatment notes from Dr.

19  Grisolia.

20          The district court's function is to review the correctness of the Commissioner's

21  decision at the time it was made.  Hudson v. Bowen, 849 F.2d 433, 435 (9th Cir. 1988).

22  A court may also properly consider any additional materials submitted to the Appeals

23  Council in conjunction with a claimant's request for review.  Harman v. Apfel, 211 F.3d

24  1172, 1179-80 (9th Cir. 2000).  With respect to new evidence not contained in the

25  administrative record, the court may remand a case "upon a showing that there is new

26

27          [3]   Plaintiff's argument that Defendant's cross-motion and motion to strike should be
    stricken from the record due to the failure to secure a hearing date (see Pl.'s Opp'n to Def.'s
28  Mot. to Strike at 1-3) is without merit, as Defendant requested and received permission from
    the Court to file its cross-motion on May 10, 2010, and the motion to strike did not require a
    separate hearing date as it related to the pending cross-motions for summary judgment.

1  evidence which is material and that there is good cause for the failure to incorporate

2  such evidence into the record in a prior proceeding . . . ."  42 U.S.C. § 405(g); see also

3  Burton v. Heckler, 724 F.2d 1415, 1417 (9th Cir. 1984).

4          The Court therefore declines to consider the additional evidence submitted by

5  Plaintiff, except for purposes of possible remand, which the Court will discuss in further

6  detail below.  In all other respects, however, the Court recommends that Defendant's

7  motion to strike be **DENIED**.  The Court will consider the arguments set forth in

8  Plaintiff's reply.  The Court will also, however, consider the substantive arguments made

9  by Defendant in response to Plaintiff's reply; thus, the Court further recommends that

10  Defendant's request in the alternative to consider his motion to strike as his surreply be

11  **GRANTED**.

12  **B.    Motions for Summary Judgment**

13          Plaintiff contends that the ALJ's decision to deny her SSI benefits was legally

14  improper and was not supported by substantial evidence.  Plaintiff makes the following

15  arguments:  First, that the ALJ erred in her consideration of Plaintiff's 2008 lumbar MRI;

16  second, that the ALJ failed to properly consider the opinions of Plaintiff's physicians,

17  Drs. Wu, Grisolia, Zappone, and Henderson; third, that the ALJ failed to properly

18  consider Listings 12.04 and 12.06; fourth, that the ALJ improperly relied on Seagate

19  Medical Group; fifth, that the ALJ made an improper credibility determination; and sixth,

20  that the ALJ presented improper hypotheticals to the VE.

21          **1.    The ALJ Erred in Her Consideration of Plaintiff's 2008 Lumbar MRI**

22          Plaintiff argues that the ALJ's decision is not supported by substantial evidence

23  as the ALJ failed to address Plaintiff's 2008 lumbar MRI findings.  (Pl.'s Reply at 1-5.)

24  In response, Defendant observes that contrary to Plaintiff's assertion, the ALJ did

25  discuss the MRI results.  (Def.'s Surreply at 8-9.)  Defendant is correct on this point, as

26  the ALJ did indeed address the MRI results.  (See Admin. R. at 11.)  However, the Court

27  still finds that the ALJ committed error with respect to those results.

28          As set forth above, Plaintiff's 2008 lumbar MRI showed mild degenerative disk

09cv1886

1  disease at L4-L5 and L5-S1, and "*encroachment on the left L5 nerve root* from facet

2  hypertrophy and left paracentral disc bulge" (id. at 357 [emphasis added]), the latter of

3  which, as far as the Court can tell, constituted a new and potentially serious finding.

4  The only interpretation of these findings in the record is Dr. Wu's assessment of

5  February 27, 2008 that "nerve impingement" of Plaintiff's left L5 nerve root and disk

6  bulge were the cause of Plaintiff's back pain and neuropathic leg pain.  (Id. at 347.)[4]

7  There are no medical opinions in the record contradicting this assessment, as Dr.

8  Raisinghani's consultative examination predated the 2008 MRI findings and the ME

9  testified that he had not seen these results.  (See id. at 63 ["So I don't have that MRI."].)

10  Indeed, although the ME observed that based on Plaintiff's 2005 lumbar results,

11  Plaintiff's back condition did not appear to be severe enough to require surgical

12  intervention, he stated that "one would have to have a thorough independent evaluation

13  with new imaging studies to make that determination." (Id. at 63.)

14      The ALJ, in her decision, briefly mentioned the 2008 MRI findings (see id. at 11,

15  12), but does not appear to have attached any medical significance to them.  The only

16  severe impairment the ALJ found with respect to Plaintiff's lumbar spine was

17  degenerative disc disease.  (Id. at 10.)  The ALJ presumably did not find the other

18  condition revealed by Plaintiff's 2008 MRI -- the encroachment (or impingement) on the

19  left L5 nerve root -- to be severe.  It is well-settled, however, that an ALJ may not render

20  a medical judgment and interject her own medical opinion.  Tackett, 180 F.3d at 1102.

21  Thus, the ALJ's conclusions regarding Plaintiff's lumbar spine were not supported by

22  substantial evidence as no medical professional, outside of Dr. Wu, whose opinion the

23  ALJ ignored, interpreted Plaintiff's 2008 MRI findings.  Furthermore, the ALJ did not cite

24  any medical evidence supporting her determination that Plaintiff did not meet Listing

25  1.04 (disorders of the spine).  (See Admin. R. at 12.)  To the extent the ALJ relied upon

26

27      [4]  Although Dr. Wu did not expressly state that she was interpreting the MRI results, the
   Court infers she was doing so given that this opinion postdated the 2008 MRI, incorporated
28  findings contained in the MRI report, and provided information not set forth in Dr. Wu's
   previous opinions.

the opinions of Dr. Raisinghani and the ME in her decision, the opinions of these doctors with respect to Plaintiff's lumbar spine do not constitute substantial evidence as they were rendered without the benefit of Plaintiff's 2008 MRI findings.

The transcript of the administrative hearing demonstrates that the 2008 lumbar MRI report could not be located in the record at the time of the administrative hearing. (Id. at 66.)  Thus, the ME was unable to provide any testimony on the impact of the MRI findings on his evaluation of Plaintiff's condition.  Given that the ALJ came into the possession of the results prior to rendering her decision, and in view of the ALJ's duty to fully develop the record, it would have been prudent for the ALJ to, at a minimum, provide the MRI report to the ME for evaluation and comment, even after the administrative hearing had taken place.  In failing to do so, the ALJ failed to fulfill her duty to fully develop the record, and thus erred in this respect as well.  See Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996) (stating that the ALJ in a social security case has a "special duty to fully and fairly develop the record and to assure that the claimant's interests are considered").

"If additional proceedings can remedy defects in the original administrative proceedings, a social security case should be remanded."  Lewin v. Schweiker, 654 F.2d 631, 635 (9th Cir. 1981).  Here, remand is required to ascertain the medical effect of Plaintiff's 2008 lumbar MRI findings.  The Court directs that upon remand, the ALJ shall conduct further proceedings in order to ensure that all pertinent medical evidence, including Plaintiff's 2008 lumbar MRI findings, is taken into account.

**2.      The ALJ's Consideration of Plaintiff's Doctors' Opinions**

Plaintiff next contends that the ALJ failed to properly consider the opinions of Plaintiff's physicians, Drs. Wu, Grisolia, Zappone, and Henderson.

More weight is given to a treating physician's opinion than to the opinion of a nontreating physician.  Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989).  Likewise, greater weight is accorded to the opinion of an examining physician than a nonexamining physician.  Andrews, 53 F.3d at 1041.  The ALJ may disregard the

opinion of a treating physician, whether or not it is controverted.  Id.  If the treating

physician's opinion is uncontroverted, the ALJ may reject the opinion only by articulating

clear and convincing reasons.  Id.  "Where . . . a nontreating source's opinion

contradicts that of the treating physician but is not based on independent clinical

findings, or rests on clinical findings also considered by the treating physician, the

opinion of the treating physician may be rejected only if the ALJ gives specific,

legitimate reasons for doing so that are based on substantial evidence in the record."

Id. (citing Magallanes, 881 F.2d at 751, 755).  If, on the other hand, the opinion of the

claimant's treating physician is contradicted, and the opinion of a nontreating source is

based on independent clinical findings that differ from those of the treating physician,

the opinion of the nontreating source may itself constitute substantial evidence, and it is

then solely the province of the ALJ to resolve the conflict.  Id. (citing Magallanes, 881

F.2d at 751).

### a.    Dr. Wu

The ALJ mentioned Dr. Wu's report briefly, but did not explicitly "reject" any of Dr.

Wu's opinions or findings.  (See Admin. R. at 10, 11, 14.)  Defendant contends that

because Dr. Wu's opinion and findings were duplicated or addressed by other

physicians, which the ALJ gave clear and convincing reasons to reject, the ALJ's

omission was harmless.  (Def.'s Mot. at 4.)

The ALJ's failure to properly address Dr. Wu's opinion was not sufficient under

the relevant authority, and constitutes legal error.  See Hammock v. Bowen, 879 F.2d

498, 502 (9th Cir. 1989) (ALJ's failure to offer any reasons as to why he disregarded the

claimant's treating physician's opinions was legal error); Lester v. Chater, 81 F.3d 821,

830-31 (9th Cir. 1995) (requiring articulation of specific and legitimate reasons

supported by substantial evidence to discount testimony of treating physicians).  Given

Dr. Wu's extensive role in Plaintiff's treatment history, as well as the fact that she is the

only physician whose interpretation of Plaintiff's 2008 lumbar MRI is contained in the

record, Dr. Wu's opinions warranted more consideration and discussion than provided

in the ALJ's decision.  See, e.g., 20 C.F.R. § 404.1527 ("Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone. . . .").

Again, "[i]f additional proceedings can remedy defects in the original administrative proceedings, a social security case should be remanded." Lewin, 654 F.2d at 635.  Accordingly, remand is proper.  See McAllister v. Sullivan, 888 F.2d 599, 603-04 (9th Cir. 1989) (remanding case for further proceedings including, potentially, the provision of specific and legitimate reasons for disregarding the report of the claimant's treating physician).  The Court recommends that the case be remanded for further consideration of Dr. Wu's opinions, particularly her view that the findings on Plaintiff's 2008 lumbar MRI established the cause of Plaintiff's disabling back pain and neuropathic leg pain.

### b.    Dr. Grisolia

As with Dr. Wu, the ALJ mentioned Dr. Grisolia's report briefly, but did not explicitly "reject" Dr. Grisolia's opinions or findings.  (See Admin. R. at 11.)  Defendant contends that Dr. Grisolia was not a treating physician, as he saw Plaintiff on only two occasions.  Defendant also questions his opinion that Plaintiff was disabled, as Dr. Grisolia rendered this opinion without having seen the 2008 MRI results.  (Def.'s Mot. at 9.)  In response to Defendant's contention that Dr. Grisolia was not a treating physician, Plaintiff attached copies of Dr. Grisolia's treatment notes to her reply.  (See Pl.'s Reply, Doc. 22-4 at 1-2.)

Under the regulations, a treating physician is defined as a medical source who has provided treatment *or evaluation*, so long as the relationship with the medical source is based on medical need for treatment or evaluation, rather than solely on a need to obtain a report in support of a claim for disability.  20 C.F.R. § 404.1502 (emphasis added).  There is no indication in the record that Plaintiff consulted with Dr.

1  Grisolia solely for the purposes of obtaining a report to support her disability claim.

2  Moreover, the question of whether a doctor is or is not a treating physician does not

3  depend on the number of times the patient has seen the doctor.  See id. ("We may

4  consider an acceptable medical source who has treated or evaluated you only a few

5  times or only after long intervals (e.g., twice a year) to be your treating source if the

6  nature and frequency of the treatment or evaluation is typical for your condition(s).").

7  Dr. Grisolia is a specialist, a neurologist, and thus it would not be unreasonable for

8  Plaintiff to have consulted with him only twice over the course of two years.

9  Additionally, given Dr. Angle's conclusion in 2006 that Plaintiff's leg symptoms were not

10 a result of a vascular condition, but rather potentially a neurological one (see Admin. R.

11 at 272), as well as Dr. Wu's supposition that same year that Plaintiff's burning

12 sensations could be due to neuropathy (see id. at 273), it is perfectly logical that Plaintiff

13 would consult with a neurologist in 2007.  The Court finds, based on the record before it,

14 that Dr. Grisolia was a treating physician.[5]

15      Defendant's questioning of Dr. Grisolia's opinion that Plaintiff was disabled, which

16 was based on speculation about Plaintiff's MRI results, is a valid concern.  However,

17 this was not a point raised by the ALJ in her decision, and thus the Court cannot

18 consider it.  See, e.g., Ceguerra v. Sec'y of Health & Human Servs., 933 F.2d 735, 738

19 (9th Cir. 1991) (("A reviewing court can evaluate an agency's decision only on the

20 grounds articulated by the agency.").

21      An opinion of a treating physician is given deference and thus even if, as here,

22 the opinion is contradicted, the ALJ must articulate "specific and legitimate" reasons

23 based on substantial evidence in the record for rejecting such an opinion.  The ALJ did

24 not meet that burden here.  Accordingly, the Court recommends that the case be

25 remanded for further consideration of Dr. Grisolia's opinions.

26 //

27 _____

28 [5]  The treatment notes provided by Plaintiff with her reply simply correspond with the reports by Dr. Grisolia already contained in the record (see Admin. R. at 356, 355) and thus are superfluous and had no impact on the Court's finding.

### c.   Dr. Zappone

Plaintiff next contends that the ALJ improperly rejected the opinion of Dr.

Zappone.  The ALJ stated the following with respect to this doctor:

> In terms of the claimant's alleged depressive disorder, the record reflects that although the claimant was taking antidepressants, they were prescribed by the claimant's family physician.  The claimant had not received any treatment from mental health specialists.  At some point, the claimant did see Dr. Zappone, a psychiatrist.  The claimant was not a patient of his.  Rather, he was selected by the claimant's attorney, Alexandra Manbeck, for a psychiatric evaluation.  This was a one time visit and the conclusions reached by this doctor are not supported by the record.  The Mental Status Examination was not creditable.  There is no treatment to support his conclusions.
>
> According to Dr. Zappone, the claimant had marked limitations in activities of daily living, maintaining social functioning and deficiencies of concentration, persistence and pace and 1 or 2 episodes of decompensation (citation omitted).  It is interesting to note that although Dr. Zappone was selected by the claimant's attorney to examine her, he directed his report to Disability Determinations so that it gives the false impression that it was a consultative examination report prepared at the request of said agency and that the author was a member of its panel of impartial examiners.  Without performing a credible mental status exam and no treatment to support his conclusions, he nonetheless asserts that the claimant met Listings 12.04 and 12.06 [citation omitted].  He also opined that the claimant had marked limitations [citation omitted].

(Admin. R. at 14, 15.)  According to the documentation in the administrative record,

Plaintiff indeed saw Dr. Zappone on only one occasion, in August 2007.  (See Admin. R.

at 327-29, 330.)  Plaintiff, however, in her reply, contends that Dr. Zappone was her

treating psychiatrist, that she saw him 3-4 times per year in 2007 and 2008, as well as

once in 2009, and that he prescribed medication for her.  (Pl.'s Reply, Doc. 22-2 at 1

(consisting of affidavit by Plaintiff dated May 28, 2010)).  Plaintiff also attaches

handwritten notes, purportedly from Dr. Zappone, dated October 21, 2007 and January

10, 2009, as well as undated notes, to her reply.  (Id. at Doc. 22-2 at 2-3, Doc. 22-3 at

1-3.)

It is clear that the ALJ's primary reason for placing little weight on Dr. Zappone's

opinions, and the factor that colored the rest of her findings about this doctor, was her

impression that Plaintiff had seen him solely because her attorney had referred her to

him.  Plaintiff has now submitted additional evidence, beyond that contained in the

09cv1886

record, which she contends counters that supposition.  As discussed above, section 405(g) provides for remand where new evidence is material and there is good cause for the failure to incorporate the evidence in a prior proceeding.  Burton, 724 F.2d at 1417. To meet the materiality requirement, the new evidence must bear directly and substantially on the matter.  Id.  If new information surfaces after the Commissioner's final decision and the claimant could not have obtained that evidence at the time of the administrative proceeding, the good cause requirement is satisfied.  Booz v. Sec'y of Health & Human Servs., 734 F.2d 1378, 1380 (9th Cir. 1984).

The new evidence submitted by Plaintiff is material to the issue of whether or not Dr. Zappone was a treating physician.  The harder question is whether the good cause requirement has been satisfied.  Plaintiff offers no explanation why she did not submit Dr. Zappone's treatment notes prior to the administrative hearing, which was held in August 2008, so the ALJ could consider them.  If Plaintiff's affidavit is accurate, Plaintiff had already seen Dr. Zappone a handful of times in 2007 and 2008.  However, the Court also notes that notwithstanding her concerns about Dr. Zappone, namely, that Plaintiff's attorney had referred Plaintiff to him, that he had seen Plaintiff only one time, and that the doctor had curiously addressed his report to the "State Department of Social Services," the ALJ asked absolutely no questions about Dr. Zappone during the administrative hearing.  Thus, Plaintiff was not given an opportunity to provide testimony that could bear upon Dr. Zappone's status as a treating physician.

Therefore, and because the Court otherwise recommends that this matter be remanded, the Court directs that upon remand, the ALJ shall reconsider whether Dr. Zappone was a treating physician and shall reassess her findings concerning this physician.

### d.    Dr. Henderson

Plaintiff next contends that the ALJ failed to provide legitimate reasons to reject the opinion of Dr. Henderson.  The ALJ stated the following with respect to this doctor:

> Dr. Henderson opined that the claimant would not be able to perform any work at all due to the combination of her physical and mental illnesses.

> When speaking about physical matters such as orthopedic ailments and manipulative issues, Dr. Henderson is not an expert and thus his summary conclusions are not entitled to any weight.  [¶]  Dr. Henderson provided no progress notes or objective mental status examination in support [of] his opinions.  Dr. Henderson does not appear to be a treating physician, but even if he were, his opinions are contradicted by substantial evidence by way of the examination and report of the state agency program psychiatrist H. Amado, M.D. [citation omitted].  Finally, Dr. Henderson's conclusions that the claimant suffers disabling depression are based almost entirely on the claimant's self-reporting of history and symptomatology.  His conclusions are no more reliable than the self-reporting on which they are based.  In addition, the doctor indicated that since July 2007, the claimant had been his patient, he failed to say how many visits she had with him during that time period.  Conspicuously absent are any of the treatment notes upon which he allegedly based his opinion.  I give very little weight to the opinion of Dr. Henderson.
>
> On August 16, 2008, after the hearing in this matter, Dr. Henderson issued a second report.  The first page contains many of the same points raised in the prior report [citation omitted].  Much of the report is based on sheer speculation and not facts.  For example[,] in paragraph 3 of the [first] page, the doctor "opines" that as to the Seagate doctor, Dr. Henderson "doubted he [the Seagate doctor] had any knowledge of the side effect of the medications the patient had been taking."  He also said that he believed that the Seagate doctor "did not take into account any of the disabling physical impairments which affect the patient."  These statements are without foundation and are pure speculation [citation omitted].  The first paragraph on page 2 of this exhibit is nothing more than ramblings, often on topics that are not relevant to the instant matter, such as his discussion regarding worker's compensation patients [citation omitted].  I assign this opinion little weight.

(Admin. R. at 14-15.)  In contrast, the ALJ stated, "The undersigned has assigned significant weight to the examining physician's and state agency medical consultant's opinions . . . ."  (Id. at 16 [referring to opinions of Drs. Rodriguez and Amado].)

Plaintiff argues that the only reason articulated by the ALJ for rejecting Dr. Henderson's opinion was that he failed to submit progress notes.  (Pl.'s Mot. at 15.)  Obviously, as seen above, this is a mischaracterization of the record.  The ALJ also found that as a psychiatrist, Dr. Henderson was not an expert on orthopedic issues; Dr. Henderson had not conducted an objective mental status examination; his opinion was contradicted by Dr. Amado; that his opinion was based on Plaintiff's self-reporting, which the ALJ found problematic as she questioned Plaintiff's credibility; and Dr. Henderson's report was based on speculation.

Dr. Henderson's opinion that Plaintiff was mentally disabled (see Admin. R. at

354, 364) was contradicted by Dr. Rodriguez's opinion that from a psychiatric point of view, Plaintiff did not have a severe impairment and that she had, at most, mild functional limitations (id. at 231), as well as Dr. Amado's opinion that Plaintiff did not have any severe impairments and did not have any functional limitations other than mild limitations (id. at 234, 242, 244).  Thus, assuming (as the ALJ did) that Dr. Henderson was a treating physician, in order to reject Dr. Henderson's opinion, the ALJ was required to articulate specific, legitimate reasons for doing so based on substantial evidence in the record.  Andrews, 53 F.3d at 1041.

With respect to the ALJ's discounting of Dr. Henderson's opinion because of the lack of treatment notes in the record, the Court finds that this was a sufficiently specific and legitimate reason, at the time it was made, to discount Dr. Henderson's opinion because notwithstanding two requests by the state agency for Dr. Henderson's medical records (see Admin. R. at 372-75), these records had apparently not been provided by the time the administrative hearing occurred.  The Court notes that Plaintiff attempted to rectify this issue by submitting Dr. Henderson's treatment notes to the Appeals Council after the ALJ issued her decision.  (See Admin. R. at 132-33, 376-87.)  It can be important for an ALJ to be able to review treatment notes because a treating physician's opinion may be rejected by the ALJ when it conflicts with the physician's treatment notes.  See, e.g., Holohan v. Massanari, 246 F.3d 1195, 1205 (9th Cir. 2001).

The ALJ's second proffered reason for discounting Dr. Henderson's opinion, that he was not qualified to opine as to Plaintiff's orthopedic issues, is a sufficiently specific and legitimate reason to discount his opinion as to Plaintiff's physical ailments, but was not so as to Plaintiff's mental condition.  The third stated reason for discounting Dr. Henderson's opinion, that he did not provide an objective mental status examination is not persuasive to the Court.  Dr. Rodriguez's mental status examination, which the ALJ apparently deemed reliable, provided an assessment of Plaintiff in each of the following areas:  appearance/attitude/behavior, thought processes, thought content, mood and affect, speech, intellectual functioning, memory, fund of knowledge, concentration and

09cv1886

calculation, proverbs, similarities, and insight and judgment.  (Admin. R. at 228-30.)

These areas also appear to have been assessed by Dr. Henderson.  (See, e.g., id. at

352-53 [discussion of, *inter alia*, Plaintiff's behavior, memory, mood, and ability to

concentrate].)  If the ALJ believed Dr. Henderson's mental status examination to be

deficient, she was required to articulate the specific and legitimate reasons *why* she

found that to be the case.

The fourth reason that the ALJ discounted Dr. Henderson's opinion, that it was

contradicted by the opinion of Dr. Amado, was not a permissible reason.  See Morgan v.

Commissioner, 169 F.3d 595, 602 (9th Cir. 1999) ("The opinion of a nonexamining

medical advisor cannot by itself constitute substantial evidence that justifies the

rejection of the opinion of an examining or treating physician.").  As to the fifth reason,

that Plaintiff's questionable credibility cast doubt upon her self-reports to Dr. Henderson,

the Court intends to direct the ALJ to reexamine Plaintiff's credibility upon remand.

Finally, the sixth reason for rejecting Dr. Henderson's opinion, that his report was based

on speculation, such as why the Seagate doctor (Dr. Rodriguez) may have found that

Plaintiff was not mentally disabled, is a valid concern, but is not a sufficiently legitimate

reason to disregard essentially *all* of Dr. Henderson's findings.

In sum, the Court finds that the ALJ did not articulate sufficient specific and

legitimate reasons for rejecting Dr. Henderson's opinion regarding Plaintiff's mental

disability and limitations, and thus Dr. Henderson's opinion was improperly rejected.

The Court accordingly recommends that the ALJ, upon remand, be required to provide

further consideration of Dr. Henderson's opinions.

### 3.      Listings 12.04 and 12.06

Plaintiff next argues that she suffers from mental impairments which meet

Listings 12.04 (affective disorders) and 12.06 (anxiety related disorders) of the Listing of

Impairments.  The Listing of Impairments sets forth certain impairments which are

considered to be of sufficient severity to prevent the performance of any gainful activity.

See 20 C.F.R. § 404.1525(a).  To meet a Listing, the evidence of record must be

sufficient to establish the existence of every medical and other finding specified for that Listing.  See 20 C.F.R. § 404.1525(d); Key v. Heckler, 754 F.2d 1545, 1549-50 (9th Cir. 1985).  A claimant has the burden of proving disability, including disability based on the Listings.  See Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995).

Plaintiff rests her argument upon the opinions of Drs. Zappone, Grisolia, and Henderson, which each stand to be reevaluated by the ALJ upon remand.  The Court accordingly recommends that the ALJ concurrently reconsider upon remand whether Plaintiff meets Listings 12.04 and 12.06.

### 4.   Reliance on Seagate Medical Group

Plaintiff next contends that Dr. Rodriguez's psychiatric evaluation of Plaintiff is of questionable probative value as reports by Seagate Medical Group have "been discredited in the past by numerous claimants and their attorneys."  (Pl.'s Mot. at 17-18.)  She attaches numerous documents to her motion to support this assertion.  (See id. at Ex. A.)  As Defendant persuasively argues, however, Plaintiff has provided no argument or evidence suggesting that there have been any complaints concerning the accuracy of reports from *Dr. Rodriguez*, or that Seagate should be discredited in *this* case, and thus the documents provided by Plaintiff are irrelevant.  (Def.'s Mot. at 17.)

### 5.   Plaintiff's Credibility

Plaintiff argues that the ALJ's finding that Plaintiff was not credible was improper. In determining a claimant's residual functional capacity, the ALJ must consider all relevant evidence in the record, including medical records, lay evidence, and "the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment."  See Robbins v. Soc. Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006) (citing SSR 96-8p, 1996 WL 374184, at *5).  "Careful consideration must be given to any available information about symptoms because subjective descriptions may indicate more severe limitations or restrictions than can be shown by objective medical evidence alone."  SSR 96-8p, 1996 WL 374184, at *5.  When considering a claimant's subjective symptom testimony, "if the record establishes the existence of a

09cv1886

medically determinable impairment that could reasonably give rise to the reported

symptoms, an ALJ must make a finding as to the credibility of the claimant's statements

about the symptoms and their functional effect."  Robbins, 466 F.3d at 883 (9th Cir.

2006) (citations omitted).  "While an ALJ may find testimony not credible in part or in

whole, he or she may not disregard it solely because it is not substantiated affirmatively

by objective evidence."  Id.  Rather, an ALJ may only find a claimant not credible by

making specific findings as to credibility and stating clear and convincing reasons to

discount the claimant's subjective symptom testimony.  Id.   Here, the ALJ stated the

following regarding Plaintiff's credibility:

> The claimant asserts that because of her illnesses, she cannot work.
> However, she testified at the hearing that the real reason she cannot work
> is because her husband would not let her.  Moreover, it is important to
> point out that the claimant has never worked.  In her Adult Function
> Report, the claimant stated that she shopped, did household chores and
> took care of her children.  However, at the hearing she testified that she
> could not do any of these things and that her sister-in-law did them all for
> her.  The claimant also stated in the Adult Function Report that she wore
> glasses to watch television and to read.  At the hearing however, she told
> the undersigned that she did not wear any glasses [citation omitted].  The
> medical records also reveal inconsistencies about what the claimant could
> and could not do.  She insisted at the hearing that she could not work and
> that she could not take care of her husband and children because she was
> disabled.  However, on June 13, 2006, the doctor told her to speak to her
> husband regarding the amount of housework she is doing and to try to
> reduce it [citation omitted].  Based on these inconsistencies, the
> undersigned finds the claimant to be not credible.

(Admin. R. at 13-14.)

The issue of Plaintiff's credibility should, upon remand, be reexamined after

proper consideration has been given to the medical evidence concerning Plaintiff's

mental and physical impairments, as discussed above.  It is possible that proceedings

on remand will render some of the credibility issues moot.  Even so, the Court finds it

worthwhile to make the following observations about the ALJ's stated reasons for

finding Plaintiff not credible:

First, Plaintiff's statements about being unable to work due to her husband's

wishes and/or because of her religion (see Admin. R. at 40-41, 228) clearly cast doubt

on her credibility, as does her statement to Dr. Wu that her days were full of chores,

09cv1886

including making three meals per day for her family and mother-in-law, and taking care of her children (id. at 259).  However, other than Plaintiff's somewhat ambiguous statement at the administrative hearing in 2008 ("Because of religion we usually don't work outside the house but because of my illness, he also does not allow me to work outside the house."), these statements were each made in 2006.  The evidence in the record indicates that Plaintiff's symptoms may have worsened subsequent to these statements.  (See, e.g., id. at 327 [in 2007, Plaintiff reported becoming increasingly depressed over the previous few years]; id. at 52 [sister-in-law's testimony that symptoms had worsened over time].)  Second, the ALJ states that in her Adult Function Report, Plaintiff reported that she shopped, did household chores, and took care of her children.  (Id. at 13.)  This is, however, not a completely accurate depiction of the contents of the Adult Function Report.  For example, Plaintiff wrote that her husband helped her with her children and with meals.  (Id. at 158, 159.)  She also wrote that though she did laundry and vacuumed once per week, sometimes she was too weak to do so.  (Id. at 159.)  With respect to the issue of Plaintiff's glasses, Plaintiff wrote in her Adult Function Report in 2006 that she wore glasses when watching television, when reading, and sometimes while driving.  (Id. at 163.)  This does not necessarily conflict with Plaintiff's hearing testimony in 2008 that Plaintiff did not wear her prescribed eyeglasses because she could not see well with them on.  (Id. at 36.)  It is possible, for example, that Plaintiff's prescription had simply changed.  In order for this to constitute a clear and convincing reason to find Plaintiff not credible, the ALJ must explain with specificity why this should serve as a basis to discredit Plaintiff's subjective symptom testimony.  See, e.g., Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993).

The Court recommends that the ALJ should reconsider Plaintiff's credibility upon remand.

**6.    Hypothetical Questions Posed to the VE**

Finally, Plaintiff argues that the hypothetical questions posed by the ALJ to the VE were inadequate and improper.  The ALJ must pose a hypothetical to the VE that

outlines all limitations of the claimant which are supported by the record.  See DeLorme
v. Sullivan, 924 F.2d 841, 850 (9th Cir. 1991).  The VE's testimony must be reliable in
light of the medical evidence in order to qualify as substantial evidence.  Kornock v.
Harris, 648 F.2d 525, 527 (9th Cir. 1980).  If an ALJ's hypothetical fails to reflect all of
the claimant's limitations that are supported by the record, the expert's testimony cannot
support a finding that the claimant could perform jobs in the national economy.
DeLorme, 924 F.2d at 850.

The proceedings on remand may render this issue moot, as it is possible that
new hypothetical questions will be posed to the VE.  This Court recommends that the
ALJ consider Plaintiff's arguments on this matter, as well as the above principles, when
reconsidering the merits of her case.

**C.    Remand is Appropriate**

In conclusion, the Court finds that the ALJ erred in her consideration of Plaintiff's
2008 lumbar MRI as well as the opinions of Dr. Wu, Dr. Grisolia, and Dr. Henderson.
Remand is warranted when additional administrative proceedings can remedy defects in
the original decision.  Lewin, 654 F.2d at 635.  Upon remand, the ALJ should properly
consider and discuss the 2008 lumbar MRI findings, the opinions of Drs. Wu, Grisolia,
and Henderson, and shall reevaluate her findings regarding Dr. Zappone, Listings 12.04
and 12.06, and Plaintiff's credibility, as well as the hypothetical question(s) posed to the
VE.

**VIII.  CONCLUSION**

For the reasons set forth above, Plaintiff's motion for summary judgment should
be **GRANTED IN PART**, Defendant's cross-motion for summary judgment should be
**DENIED**, Defendant's motion to strike should be **GRANTED IN PART** and **DENIED IN
PART**, and the case should be remanded for further proceedings.

This report and recommendation will be submitted to the Honorable Janis L.
Sammartino, United States District Judge assigned to this case, pursuant to the
provisions of 28 U.S.C. § 636(b)(1).  Any party may file written objections with the Court

and serve a copy on all parties on or before **August 10, 2010**.  The document should be captioned "Objections to Report and Recommendation."  Any reply to the Objections shall be served and filed on or before **August 24, 2010**.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the district court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

**IT IS SO ORDERED**.

DATED:  July 26, 2010

Jan M. Adler
U.S. Magistrate Judge

28

09cv1886